The opinion of the court was delivered by
Watkins, J.
Plaintiffs claiming to be the sole and exclusive owners of a certain trade mark which they adopted in 1893, and have since used to distinguish their Aromatic Cocktail Bitters, and to which they have at all times had the exclusive right of use; and alleging that the defendant has been guilty of an infringement thereof, prayed for a writ of injunction against him and his agents and employees from further using or attempting to use same, directly or indirectly, or any trade mark of similar design or device. They also alleged a resulting injury from said infringement, and prayed for compensatory damages in the sum of two thousand five hundred dollars.
On the trial there was judgment pronounced in favor of the plaintiff for four hundred and fifty dollars damages, perpetuating the injunction, and the defendant prosecutes this appeal, after making an unsuccessful effort to obtain a new trial.
The following extract from the brief of the plaintiffs’ counsel very accurately states their side of the case, and we have adopted it for convenience of statement, to-wit:
“ Thos. H. Handy was carrying on a wine and liquor business in this city, at Nos. 12 and 14 Royal street, for many years prior to 1874, and in connection therewith manufactured and sold an ‘ Aromatic Cocktail Bitters,’ according to a formula which he had purchased from Peyehaud, who remained in Handy’s employ up to the time of his death in 1876. About that time Handy became involved, financially, and required fresh capital for said business, obtained the same from William MeQuoid — who became the real principal of the house — with Thos. H. Handy as his agent, and, thereafter, the business was carried on, at the same place, under the style of ‘Thos. H. Handy, Agent;’ Handy retaining his interest therein until his death, when a new jfirm was entered into, under the style of Thos. H. Handy & Co., composed.of the said William MeQuoid, Thos. H. Handy’s widow, and two clerks who had been *1121 employed in the house when the same was conducted in the name of ‘ Thos. H. Handy, Agent.’
“During all of these years the aforesaid ‘Aromatic Cocktail Bitters’ compounded under the ‘ formula ’ which Handy had purchased from Peychaud, was manufactured and sold by Thos. H. Handy, Thos. H. Handy, Agent, and Thos. H. Handy & Oo., under the ‘TRADEMARK,’ which is declared on by plaintiffs in the above entitled suit.
“Defendant, 'Commander, was-in plaintiff’s employ for several years, and while his services were thus engaged and paid for by plaintiffs, he learned the aforesaid ‘ formula ’ for their ‘ Aromatic Cocktail Bitters.’ Commander left plaintiffs’ employ in 1898, and soon afterward set up a rival establishment for the manufacture and sale of their aforesaid ‘Aromatic Cocktail Bitters,’ and put the same on the market, through solicitors and canvassers, under Handy & Co.’s ‘ trade mark,’ and thereby did all in his power to deceive the public into the belief that he was selling plaintiffs’ ‘ Aromatic Cocktail Bitters.’ In size, style, color, lettering and execution, and word for word, not a point of difference exists between the ‘ trade mark ’ of Handy & Co. and the ‘ trade mark ’ thus put forth by Commander, except that the latter is styled ‘ Commander’s Bitters,’ while the former is styled ‘ Handy’s Bitters.’ An inspection of the two ‘ trade marks,’ which are attached to page 15}£ of the transcript of appeal, will show their exact identity with the above exceptions, and will conclusively establish defendant’s palpable and flagrant infringement of plaintiffs’ ‘ trade mark.’ ”
Plaintiffs complain that on account of the aforesaid infringement of their trade mark they found themselves competing with the defendant, as a seller of their own goods, under what appeared, on a casual examination, to be their own trade mark; and which he had thus wrongfully appropriated for the purpose of inducing the belief that the goods he was selling were the aromatic cocktail bitters.
That in a short time they came to realize that the defendant was, by this means, depriving them of a very large part of their trade, as their sales had become reduced from a total of eighty-one cases sold in December, 1893, to a total of twelve cases sold in August, 1894.
The defence was a.general denial.
The defendant’s counsel frankly admits in his brief that “ the evidence proves beyond the peradventure of a doubt that the Peychaud Bitters is the leading and recognized standard bitters in this market, *1122 and that the Peyehaud Bitters, Handy Bitters and Commander Bitters are one and the same thing.”
That the formula used is not patented and not proprietary, and that the reputation of the concoction was made in the name of the Peyehaud Bitters — originally prepared by a man of that name.
He further states that said preparation was made and for a long time sold as the Peyehaud Bitters under a label containing the following legend, viz.:
“ Peychaud’s American Aromatic Bitter Cordial. This cordial is the most palatable and flavorous ever yet prepared from aromatic and bitter ingredients, eminently calculated to open the appetite and invigorate the functions of the stomach, and thereby prevent dyspepsia. Dose for adults one to two tablespoonsful before meals in a little sugar and water, or in a little sherry, madeira or brandy if preferred. For children, from one to three teaspoonsful, according to age. Mixed with anisette and a little water it makes a most pleasant stomachic.”
That under this label it attained a great and lasting popularity with the public.
He then represents that Thos. H. Handy became acquainted with the formula, and for several years made the same preparation, which he sold under the name of Handy’s Aromatic Cocktail Bitters, with a legend copied almost verbatim from that employed on the Peyehaud Bitters, to-wit:
“ Handy’s Aromatic Cocktail Bitters. These bitters are the most palatable and flavorous ever sold prepared from aromatic and bitter ingredients. It stimulates the appetite and invigorates the functions, thereby preventing dyspepsia. A teaspoonful to be taken either with sherry or madeira, or if preferred, with a little anisette or brandy, with or without water, which thus makes a very light and pleasant tonic.”
He then alleges that the bitters thus labeled, Thomas H. Handy sold in competition with Peyehaud until the time of his death.
Then follows the following important admission, viz.:
“ Anthony Commander, the defendant in this suit, who also knew the formula by which the ‘ Peyehaud Bitters ’ were made, determined to go into the business of manufacturing and selling bitters on this market in competition with the ‘ Peyehaud Bitters,’ and began selling his product in April, 1894, under a label similar in wording to that of the Handy people, but stating clearly thereon that it was *1123 * Commander’s Aromatic Cocktail Bitters,’ prepared by A. Commander, sole proprietor, and never sought to induce any one to believe that he was selling Handy’s bitters, but sold them on their own merits, as his own bitters, claiming and stating to the trade that they were iully as good as the ‘ Peychaud Bitters; ’ and much cheaper.
“He employed popular and energetic salesmen, spending his money liberally, and pushed the sale of his bitters from April 1, 1894, to August 81, 1894, when the present suit was instituted and the injunction sued out.”
We append the fao simile of the two trade marks of Thomas H. Handy & Co. and of A. Commander, for the purpose of making the comparison between them, viz.:

*1124

From a casual inspection it is readily perceived that the two are identical in design and phraseology; and only differing in the name of the proprietors, and their respective places of business.
The testimony is brief and generally consistent; but as our learned brother of the District Court has made a very careful analysis of it, we have chosen to reproducé the same in its entirety as the mos't accurate statement of the case of which it is susceptible, viz.:
“On the proofs made there can be no question that Thos. H. Handy, for value given, acquired the right to manufacture and sell the bitters in question. This right Mr. Peychaud, whom both parties recognize, sold Handy, and thereafter entered Handy’s employ, and, for years, served on a salary paid to him by Handy, as manufacturer *1125 for Handy, of said bitters. At that time Handy adopted a trade mark, for the sale of the bitters thus manufactured for him, by Peyehaud, and this manufacture and sale, under said trade mark, Peyehaud remaining in his service for the purpose, continued for years. The defendant in like manner, was in Handy’s employ, and there learned to compound the bitters, known as Handy’s bitters, with full knowledge of said trade mark, and of Handy’s rights in the premises; when defendant quit Handy’s employ he set up a rival establishment, began the manufacture of said bitters, put them on the market for sale, with solicitors and canvassers engaged to sell them; and to do this, he appropriated, without right, Handy’s trade mark. In size, in style and color, in lettering and execution word for word, there is not a point of difference between the trade mark of Handy and the trade mark put forth by defendant, except, that the latter is styled * Commander’s Bitters,’ while the former was styled ‘ Handy’s Bitters.’
“ In defence against plaintiffs’ action against him for this appropriation and infringement, defendant asserts and argues that plaintiffs are themselves without right or title to the Handy bitters and Handy trade mark. On this issue I find that plaintiffs’ firm'is composed of: First, Mr. McQuoid, who, as the principal, with Thos. H. Handy, his agent, was engaged in the use of said trade mark and the manufacture of said bitters and their sale thereunder; second, of Thos. H. Handy’s widow, he having departed this life; third, of Mr. Wilkerson, who was also with Thos. H. Handy, agent, as employee; and, fourth, of Mr. Minnet. Their place of business is where Handy transacted his business. And thus it seems that Handy transmitted to the plaintiffs his right to manufacture the Handy bitters, and the right to the trademark, which he had adopted, as has been shown, by title from Peyehaud and by Peychaud's acquiescence. On this showing it would seem clear that Handy’s title, possession and use of the trade mark for years, acquiesced in by Pey-chaud, and by defendant, were thus transmitted to the plaintiffs, and that their possession and use, since his death, are sufficient to enable them to stand in judgment, and to defend their possession and right of use of said trade mark against defendant’s trespass and encroachment, especially when defendant alleges no title or right in himself, and makes no effort to show any legal title or right thereto.
“ The rule of law is universal that a bona fide possessor, presuma *1126 bly the owner, is not required to prove title as against a mere trespasser.
“ On the trial defendant testified that Handy was an infringer upon Peychaud’s rights, an appropriator of Peychaud’s trade mark, and that he (defendant) considered that he (defendant) has as much right to do this as Handy had.
“ Reference to the Peychaud label shows that Handy did no such thing. There is in language, design and execution, a total dissimilarity between the Handy trade mark and the trade mark of Pey - chaud, to which latter (it would seem) Mr. Jung has succeeded.
“Besides this fact as already stated, it is shown that Handy acquired his right to manufacture bitters similar to Peychaud’s from Peychaud himself, and that Peychaud, with full knowledge and acquiescence, served in Handy’s employ, making the Handy Bitters under the trade marie then used by Handy, and afterward by Handy, Agent, and since his death by Handy’s widow and her associates in the plaintiff firm, who were his associates and employees, or principal, while he was living and so engaged in said business.
“ Therefore defendant’s denial of plaintiffs’ title is without legal effect in the first place, and in the second place his excuse for his-infringement makes him, in the eye of the law, a wanton trespasser, because, in the third place, he bases his trespass or infringement on the assumption that Handy was a trespasser, which we have seen is groundless and false, and last and worse of all he presents himself as a wanton trespasser, willing to infringe upon Handy and Peychaud alike, for his own profit and at his caprice.
“ There can be no excuse, in law or in morals, for such conduct,, and a court of equity would not hesitate to protect by injunction the plaintiffs in their use and possession of the Handy trade mark, under such circumstances.”
For the purpose of fully disclosing the difference between the Handy trade mark and the original Peychaud trade mark we have-appended the latter, viz.:

*1127

These different labels point unerringly to the same aromatic bitter cordial that all parties used at different times and under different circumstances.
We are of the opinion that plaintiffs have made their case quite clear; and that the defendant has been guilty of an infringement *1128 of their right to use exclusively the trade mark, viz.: “Handy’s Aromatic Cocktail Bitters.”
The law applicable to trade mark is very well stated in TradeMark cases, 100 U. S. 82, in which Mr. Justice Miller, speaking for the court, said:
“ The right to adopt and use a symbol or a device to distinguish the goods or property made or sold by the person whose mark it is, to the exclusion of use byall other persons, has been long recognized by the common law and the chancery courts of England, and of this country, and by the statutes of some of the States. It is a property right for the violation of which damages may be recovered in an action at law, and the continued violation of it will be enjoined by a court of equity, with compensation for past infringement.
“ This exclusive right was not created by the act of Congress, and does not depend upon it for its enforcement. The whole system of trade-mark property and the civil remedies for its protection existed long anterior to that act, and have remained in full force since its passage.
“ These propositions are so well understood as to require neither the citation-of authorities, nor elaborate argument to prove them.”
Again:
“The trade mark may be, and generally is, the adoption of something already in existence as the distinctive symbol of the party using it.
“ At common law the exclusive right to it grows out of its use, and not its mere adoption. * * * But it does not depend upon novelty, invention, discovery, or any work of the brain. It requires no fancy or imagination; no genius nor laborious thought. It is simply founded on priority of appropriation.'”
The cases therein considered were criminal prosecutions founded upon certain acts of Congress which provided for the registration of • trade marks, accompanied with a penalty for their violation, and the court held them to be unconstitutional and void.
In Manufacturing Company vs. Tranier, 101 U. S. 51, the court, speaking through Mr. Justice Field, says:
. “Every one is at liberty to affix to, a product, of his own manufacture any symbol or device, not previously appropriated, .which will distinguish it from articles of .same generabnature manufactured or sold by others,,and thus secure,toiMmself.the'.beneñts of *1129 increased sale by reason of any peculiar excellence he may have given to it. The symbol or device thus becomes a sign to the public of the origin of the goods to which it is attached, and an assurance' that they are the genuine article of the original producer. In this way it often proves to be of great value to the manufacturer in preventing the substitution and sale of' an inferior and different article ■ for his products. It becomes his trade mark, and the courts will ■ protect him in its exclusive use, either by the imposition of damages' for its wrongful appropriation or by restraining others from applying' it to their goods, and compelling them to account to them for profits made on a sale of goods marked with it. * / * *
“ The object of the trade mark is to indicate, either by its own meaning or by association, the origin or ownership of the article to Which it is applied. If it did not it .would serve no useful purpose, either to the manufacturer or to the public; it would afford no protection to either against the sale of a spurious in place of the genuine article.”
In McLean vs. Fleming, 96 U. S. 245, a case is stated quite similar to the instant one, in that the plaintiff sought by injunction to restrain the defendant from infringing upon his trade mark for his liver pills, claiming the “ exclusive ownership of a certain medicinal manufacture known as ‘Dr. C. McLean’s Liver Rills,’ and of the trade mark used in advertising and vending the same.”.
In the course of their opinion the court said:
“ Equity gives relief in such a case, upon the ground that one man is not allowed to offer his goods for sale, representing them to be the. manufacture of another trader in the same commodity.
“ Suppose the latter has obtained celebrity in his manufacture, he is entitled to all the advantages of that cele‘brity, whether resulting from the greater demand for his goods, or from the higher price the public are willing to give for the article, rather than for the goods of the other manufacturer, whose reputation is not so high as a manufacturer.
“ When, therefore, a party has been in the habit of stamping his goods with a particular mark or brand, so that the purchasers of his goods having that mark or brand know .them to be of his manufacture, no other manufacturer has a right to adopt the same stamp, because, by doing so, he would be substantially, representing. the goods to be the manufacture of the person who first adopted the *1130 stamp, and so would or might be depriving him of the profit he might make by the sale of the goods which the purchaser intended to buy.
“ What degree of resemblance is necessary to constitute an infringement is incapable of exact definition, as applicable to all cases.
“All that courts of justice can do, in that regard, is to say that no trader can adopt a trade mark, so resembling that of another trader, as that ordinary purchasers, buying with ordinary caution, are likely to be misled.”
Similar principles have been recognized in the decisions of this court, and notably in Udolpho Wolfe vs. Barnett & Lion, 24 An. 97, in which the defendants were enjoined from preparing and selling, or offering to sell, any imitation of the plaintiff’s celebrated gin, under the title or name of “Wolfe’s Aromatic Schiedam Schnapps,” or from using any imitation of that name or brand, the plaintiff claiming damages for an infringement of his rights as a manufacturer of that kind of gin, and as the originator of that particular trade mark.
It appeared in the evidence in that case, that the plaintiff manufactured his gin in Holland and put it up in bottles ‘ ‘ with uniform and peculiar marks or labels,” which were used to denote his goods thus made and sold, and that in the trade this name was fully recognized as his trade mark.
Recognizing and applying the principles announced in the foregoing decisions, the court reversed a judgment of the lower court, perpetuated the injunction and awarded to the plaintiff fifteen hundred dollars damages.
In our opinion the law as well as the evidence supports the judgment appealed from.
The amount of damages awarded the plaintiffs in the instant case appears to be reasonable.
The sum of four hundred and fifty dollars will scarcely compensate them for the loss they have sustained, but it will have the effect, doubtless, of preventing the defendant from perpetrating a further infringement upon their trade mark without being burthensome or oppressive.
Judgment affirmed.