18 So.2d 629

**NEW ORLEANS CHECKER CABS, Inc., v. MUMPHREY,**

No. 37109.

May 22, 1944.

R. A. Dowling, of New Orleans, for appellant.

R. J. Pitard, Henry Voss, Henry Vosbein, and M. C. Scharff, all of New Orleans, for appellee.

O'NIELL, Chief Justice.

This is a contest over the right to use the trade name and the emblem of the "Checker Cabs" in New Orleans.

The New Orleans Checker Cabs, Inc., sued to enjoin Walter Mumphrey from conducting a taxicab business in the name "Checker Cabs". The defendant, answering the suit, set up a reconventional demand for an injunction to prevent the plaintiff from using the trade name or emblem "Checker Cab", and prayed for damages.

The judge of the civil district court, after hearing the evidence, rejected the plaintiff's demand and gave judgment for the defendant, enjoining the plaintiff, New Orleans Checker Cabs, Inc., and its agents, officers and employees, from using in its corporate name, or in its business, or on its cabs, the trade name "Checker" or "Checker Cab", or any name so similar as to confuse the public or those having dealings with the taxicab service in New Orleans or the vicinity. The defendant's demand for damages was dismissed as of nonsuit. The plaintiff has appealed from the judgment.

The defendant operated a service station and was general manager of the Independent Cab Operators' Association, in New Orleans, for some time prior to the operation of the first "Checker Cab" in this city. The service station was patronized

mainly by taxicab operators. The Independent Cab Operators' Association furnished the bonds required by the municipality, and furnished the public liability insurance for taxicab operators, for a stipulated charge per day. The defendant as general manager adjusted claims for the association; and in that way he became well acquainted with all of the taxicab operators and drivers and with the taxicab business generally. The service station was located at the place where the association conducted its business, at the corner of St. Claude and Frenchmen Street. Mumphrey operated a taxicab of his own, which he had bought from a man named Tom Bullock, in March 1940.

In April 1940, Mumphrey, by appointment, and accompanied by Tom Bullock and Sidney Blanchard, both being taxicab operators, called upon an attorney and employed him for the purpose of obtaining a copyright on the trade name and emblem "Checker Cab" and to organize the Checker Cab business. Mumphrey was to obtain the exclusive right to use the name, and the other taxicab operators were to acquire from him the right or privilege of using the name for a certain consideration. Mumphrey was to establish stands for the cabs, and to build up a good will for the taxicab business, and to supervise the taxicab drivers and the operation of the business for the mutual benefit of the taxicab operators who would patronize his business. Later a switchboard and telephone system were to be installed and the taxicab operators then were to be taxed a fee for the use of the telephone service. To operate under the Checker "flag" it was necessary

for a taxicab operator to buy all of his gasoline, oil and automobile accessories from Mumphrey, and to subscribe to membership in the Independent Cab Operators' Association. When the telephone system was installed each operator of a "Checker" cab was charged 50 cents per cab each day for the telephone service, the advertisement, and other costs incident to the business.

In May 1940 Mumphrey's attorney applied for trade-marks for Mumphrey, and filed for record with the Secretary of State the names "Checker Cab" and "Checker". The so-called trade-marks were registered in the name of Walter Mumphrey, individually, and certificates were issued by the Secretary of State to Mumphrey on June 12 and 17, 1940, respectively.

On June 12, 1940, Mumphrey, who had had his cab painted with the "Checker Cab" emblem, commenced operating the cab in New Orleans. This was the first "Checker Cab" to be operated in New Orleans for several years. In 1928 a Checker Cab was operated in the city and in 1933 there was a Star Checker Cab, but both of them were discontinued long before Mumphrey came on the field. The second cab bearing the "Checker" emblem appeared on the scene on June 17, 1940. It was operated by Tom Bullock with permission obtained from Mumphrey. Mumphrey has been operating his own cabs continuously since that time. He now owns and is operating five "Checker Cabs" in New Orleans.

On June 26, 1940, C. W. Pope, who is now president of the New Orleans Checker Cabs, Inc., commenced operating his car

as a "Checker Cab". He had bought the cab on March 18, 1940, and had operated it as a "Bonded Cab" until June 26, 1940. On that date Pope had the "Bonded Cab" painted with the "Checker Cab" emblem under an arrangement with Mumphrey and commenced operating the cab as a "Checker Cab" under the arrangement with Mumphrey. There were already five cabs being operated as Checker Cabs.

On May 7, 1941, when the telephone system was installed, a charge of 50 cents per cab per day was levied on each owner operating under the Checker Cab flag. Pope, like the other taxicab operators, paid the charge to Mumphrey. Pope testified: "The money which was paid in by the subscribers to the name Checker Cab, of which Mr. Mumphrey told me he had a charter, * * * was to be used exclusively for telephone service, advertising, and matters pertaining to the company." Pope explained that Mumphrey was to receive nothing for his services except "the benefit of the gas business". Pope paid this charge regularly up to the time when he and Mumphrey severed relations and became competitors in business.

Mumphrey is now and has been since May 1940 generally recognized by the taxicab operators in New Orleans as having the exclusive right to the use of the name and emblem of the Checker Cabs. It was on April 11, 1942, when Pope and Mumphrey, having had several disagreements, broke off their business relations. Soon afterwards Pope organized the corporation called New Orleans Checker Cabs, Inc., which is the plaintiff in this suit. He testified: "When things didn't go so good, I went to the hall and found out he [Mumphrey] didn't have it [a charter] and has never had any use of the name Checker Cab. That is when I incorporated the name myself." Pope then owned 14 cabs and transferred 9 of them to his corporation in exchange for capital stock. Soon afterwards, that is, on the 1st of May, 1942, Pope assigned to the corporation all of his "right, title and interest in and to the name, sign, symbol 'Checker' and or 'Checker Cabs'". The corporation merely painted "New Orleans", in small letters, over the name "Checker Cabs", and changed the telephone number on the cabs to the corporation's telephone number; and the corporation has been operating its cabs as "Checker Cabs" in competition with Mumphrey ever since they were so converted.

The New Orleans Checker Cabs, Inc., therefore, by using the trade name and emblem "Checker Cabs" in competition with Mumphrey, has caused much confusion with Mumphrey's Checker Cab business in New Orleans. The drivers of the New Orleans Checker Cabs, Inc., have in many instances pre-empted the taxicab stands theretofore used exclusively by Mumphrey's taxicab drivers, and in that way they have brought on quarrels between the drivers of the New Orleans Checker Cabs, Inc., and the drivers of Mumphrey's taxicabs. In many instances the drivers of the New Orleans Checker Cabs, Inc., have interfered with the right of the drivers of Mumphrey's Checker Cabs to have access to the telephones and to have the benefit of telephone calls on the telephone system in-

stalled by Mumphrey. In fact Pope admitted in his testimony: "You can't operate two companies in one city under the same name".

· In this suit, brought by the New Orleans Checker Cabs, Inc., on June 23, 1942, to prevent Mumphrey from using the name or emblem "Checker Cab" in New Orleans or vicinity, the plaintiff contends: (1) that it has the absolute and exclusive right to use the name under which it was chartered; (2) that Mumphrey's business is not incorporated and hence that he has no right to use the name "Checker Cab Company"; (3) that Mumphrey has not assumed or adopted, or recorded in the conveyance office, the name "Checker Cab Company", as required by Act No. 303 of 1926 to obtain the right to use a fictitious name or an assumed name; (4) that there is no record in the automobile license bureau of Mumphrey's having owned a taxicab in the year 1940.

Mumphrey relies not only upon his having obtained the trade name "Checker Cab" under the provisions of Act No. 49 of 1898 but also upon the law of unfair competition.

■■■ The plaintiff's contention that it has the exclusive right to use the name under which it was incorporated is answered by the decision in Albrecht v. Del Bondio, 188 La. 502, 177 So. 587, 588, thus: "A person may not use even his own name with the fraudulent intention of appropriating the good will of a business established and built up by another person of the same name."

■■■ In the case of Children's Bootery v. Sutker, 91 Fla. 60, 107 So. 345, 44 A.L.R. 698, the Supreme Court of Florida held that there was even greater justification for enjoining a corporation from engaging in unfair competition by using a corporate name voluntarily chosen by it, said: "A corporate name, although derived through authority of the state, may not be used [to deceive]. In granting a corporate charter, the state does not thereby adjudicate the legal right of the corporation to the unlimited use of the corporate name chosen." The following cases were cited: Peck Bros. & Co. v. Peck Bros. Co., 7 Cir., 113 F. 291, 51 C.C.A. 251, 62 L.R.A. 81; General Film Co. of Missouri v. General Film Co. of Maine, 8 Cir., 237 F. 64, 150 C.C.A. 266; Chas. S. Higgins Co. v. Higgins Soap Co., 144 N.Y. 462, 39 N.E. 490, 27 L.R.A. 42, 43 Am.St.Rep. 769.

■■■ Plaintiff's second and third contentions are closely related. They have reference to Act No. 64 of 1918, sections 1 and 5 of which were amended by Act No. 303 of 1926. The act provides for and regulates the right to conduct any business "under an assumed or fictitious name" and provides penalties for violation of the act. It provides that any person who shall carry on any business in an assumed name without having recorded in the conveyance office in New Orleans or in the recorder's office in any other parish than the Parish of Orleans, a so-called certificate, executed by him before a notary public, giving his name and post office address and the assumed name, shall be deemed guilty of a misdemeanor. The statute also makes it a misdemeanor for the register or recorder to issue a license for any person to do business under an assumed name without hav-

ing complied with the statute. The purpose of the act, obviously, is to prevent the obtaining of credit under an assumed name. It has been decided that a party who has incurred an obligation in favor of one who acted under an assumed name and without compliance with the statute could not escape his obligation on the ground that the transaction from which the obligation arose was conducted by the obligee under an assumed name and without compliance with the statute. Wolfe v. Joubert, 45 La.Ann. 1100, 13 So. 806, 21 L.R.A. 772; In re Pelican Ins. Co., 47 La.Ann. 935, 17 So. 427; Smith v. Williams, 152 La. 948, 949, 94 So. 859; Toelke v. Toelke, 153 La. 697, 96 So. 536; Naihaus v. Louisiana Weekly Pub. Co., 176 La. 240, 145 So. 527.

Our opinion is that the act of 1918 as amended by the act of 1926 has nothing to do with this case. Mumphrey's conducting his business in the name and under the emblem of the Checker Cab Company without having recorded his intention so to do, in the manner provided by the statute, if in fact he is so conducting his business, does not justify C. W. Pope or the New Orleans Checker Cabs, Inc., in resorting to the unfair competition which in fact Pope and the company have resorted to.

■ Referring now to plaintiff's fourth contention, the only reason why there was no record of Mumphrey's ownership of taxicabs or a taxicab in the automobile license bureau in 1940 is that the license was not transferred, notwithstanding Mumphrey bought his first cab in March 1940, and notwithstanding he commenced operations in the name and under the emblem "Checker Cabs" on June 12 of that year. The failure of Mumphrey to have the 1940 license plates transferred to his name is a matter of no importance in this case, the important fact being that the taxicabs themselves were transferred to him in 1940.

■ Act No. 49 of 1898, known as the Trade Mark Law, which is relied upon to some extent by Mumphrey, is not applicable to this case. The law purports merely to protect the owners of trade-marks, designs or other forms of advertisement of "any goods, wares, merchandise or other product of labor, as having been made, manufactured, produced, prepared, packed or put on sale by such person" so advertising the goods, wares, merchandise or other product of labor. The taxicab service is not in the category of goods, wares, merchandise or other product of labor.

■ Our opinion however is that the law on the subject of unfair competition should protect and does protect Mumphrey in his exclusive right to the use of the trade name and emblem of the "Checker Cab". The law was so applied in the following Louisiana cases: Yellow Cab Co. of New Orleans v. Jones, 156 La. 837, 101 So. 216; Marcev v. Mandich, 158 La. 15, 103 So. 389; Albrecht v. Del Bondio, 188 La. 502, 177 So. 587; Paducah Distilleries Co. v. Crescent Mfg. Co., 6 Orleans App. 151; Arbutnot, Latham & Co. v. Cage-Drew Co., 6 Orleans App. 374. In the latter case a writ of review was refused on October 13, 1909. It was said in the Marcev case [158 La. 15, 103 So. 390] and was repeated, substantially in the Albrecht case: "It is unnecessary to cite authority, of

which there is no end, holding that trade-names will be protected against unfair use, simulation, or imitation." In the Paducah Distilleries case it was held that a name "though not the subject of a technical trade-mark, will be as fully protected as if they were such, on the ground of unfair trade." And in the Arbutnot case it was held: "Property in trade marks exists independently of Act 49 of 1898 or any other statute, and there is ample protection therefor both in law and in equity outside of the provisions of that statute."

The law's protection against unfair competition by the use of another's trade name rests upon the deceit or fraud which the newcomer in the business practices,—not only upon the one already established in the business but also upon the public. 63 C.J. p. 323. In such cases priority of appropriation of the trade name determines the question as to which one of the conflicting claimants is entitled to use the trade name. 63 C.J. p. 340; Handy v. Commander, 49 La.Ann. 1119, 22 So. 230; Paducah Distilleries Co. v. Crescent Mfg. Co., 6 Orleans App. 151. In Handy v. Commander it was said that the right to the exclusive use of a trademark was "founded [exclusively] on priority of appropriation".

We concur in the finding of the judge who tried this case that Walter Mumphrey had the so-called priority of appropriation of the trade name "Checker Cabs", and that the use of the name and emblem by W. C. Pope and the New Orleans Checker Cabs, Inc., was unfair competition; hence we conclude that the judgment appealed from is correct.

The judgment is affirmed.