924 So.2d 1045 (2006)
RAMSEY'S MANUFACTURING JEWELERS, INC.
v.
Stephen M. RAMSEY, Nanci Murphy, and Steve Ramsey's Diamonds Direct, L.L.C.
No. 05-CA-307.
Court of Appeal of Louisiana, Fifth Circuit.
February 14, 2006.
*1047 Daniel A. Ranson, David D. Kervin, Jr., Gaudry, Ranson, Higgins & Gremillion, L.L.C., Gretna, Louisiana, for Plaintiff/Appellant.
Sean D. Alfortish, Gretna, Louisiana, for Defendant/Appellee.
Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS, and SUSAN M. CHEHARDY.
JAMES L. CANNELLA, Judge.
The Plaintiff, Ramsey's Manufacturing Jewelers, Inc. (Ramsey's), appeals from a judgment in a trade name infringement case in favor of the Defendants, Stephen M. Ramsey (Stephen), Nanci Murphy and Steve Ramsey's Diamonds Direct, L.L.C. We affirm in part, amend in part, and reverse in part.
*1048 In 1972, Robert Ramsey, Sr. (Robert, Sr.) began manufacturing and selling jewelry in the Greater New Orleans area, including precious and semi-precious stones, under the trade name, "Ramsey's Jewelers." The business was incorporated in 1985 under the name "Ramsey's Manufacturing Jewelers, Inc." In 1989, the names "Ramsey's Jewelers" and "Ramsey's Jewelry" were registered as trade names with the Louisiana Secretary of State, pursuant to La. R.S. 51:211, et seq. (Louisiana Trademark Law.) In 1998, Ramsey's also registered the trade name "Ramsey's Diamond Jewelers." All of the names were renewed in 2001.
Over time, the children of the original owner, Robert Ramsey, Jr. (Robert, Jr.), and Stephen Ramsey, became stockholders. Robert, Sr. had 51% of the stock, Robert Jr. was given 48%, and Stephen had 1%. At some point, the two men and their sister, Lori Ramsey, started working in the business. After Robert, Sr. died, his shares were divided among the children. Robert, Jr. became the owner of 53.4% of the shares, and Stephen had 32.1% of the outstanding common stock. Lori became owner of 14.04%.
In 1992, problems apparently arose between the two brothers. In a letter dated November 5, 2002, Robert, Jr. placed Stephen on involuntary leave of absence from his employment with the business until January 3, 2003, citing problems the parties were having in the work environment as the reason for his action. The letter expressed a hope that they could work out their differences, but noted that Stephen was barred from the store and from representing the company until they resolved their issues. In the letter, Robert, Jr. asked Stephen to let him know if Stephen wanted to terminate his employment.
Subsequently, on December 11, 2002, Stephen and Nanci Murphy formed a limited liability company domiciled in New Orleans, and named it "Steve Ramsey's Diamonds Direct, L.L.C." Stephen did not inform Robert, Jr. that he quit his employment with the family business. Robert, Jr. discovered Stephen's actions when Robert Jr.'s long-time friend and customer saw the notice in the Times-Picayune, and contacted him to ask if he was starting a new branch of the business. Robert, Jr. was concerned with Stephen's use of the Ramsey name and immediately sent certified letters to his brother requesting that Stephen cease and desist from using the Ramsey name in conjunction with the words "diamonds," "jewelry" or "jewelers." He asserted that any use by Stephen of the family name would be confusingly similar to Ramsey's registered trade names. Apparently, Stephen continued to use the name. In July of 2003, two suppliers billed Ramsey's for products purchased by the Defendants. On August 15, 2003, Stephen registered "Steve Ramsey's Diamonds Direct, L.L.C." as a trade name with the Louisiana Secretary of State.
On August 18, 2003, Ramsey's, through its attorney, sent a letter to the Defendants, through their attorney, protesting the use of the similar name. On August 22, 2003, the Defendants responded that they believed that Stephen was allowed to use his name in conjunction with "diamonds," "jewelry," or "jewelers" under trade name law.
On August 23, 2003, Ramsey's filed a petition for a preliminary and permanent injunction to enjoin the Defendants from using Ramsey's three trade names and for damages from trade name infringement, unfair trade practices, and trade name dilution. Following a hearing in September of 2003, the trial judge granted a preliminary injunction against the Defendants' use of the Ramsey name in conjunction *1049 with "diamonds," "jewelers," or "jewelry."[1]
On October 6, 2003, Stephen changed the name of his company to "Brilliantov by Steve Ramsey, L.L.C." That name was registered as a trade name on January 14, 2004.
In April of 2004, the Defendants answered the petition. They also filed various exceptions,[2] as well as a reconventional demand for damages and attorney's fees for wrongful injunction. The Plaintiff responded with an answer and affirmative defenses, asserting that the Defendants failed to mitigate their damages, and that the damages, if any, were caused by the Defendants' own fault.
Trial of the permanent injunction was held on July 22, 2004. At the conclusion of Ramsey's case, the trial judge orally granted the Defendant's motion for involuntary dismissal. On August 2, 2004, the trial judge rendered a judgment in the Defendant's favor, granting the motion for involuntary judgment of dismissal, dissolving the preliminary injunction, denying the petition for permanent injunction, and dismissing all claims by Ramsey's. The trial judge took under advisement the issue of Stephen's damages. He deferred ruling on the attorney's fees issue pending an evidentiary hearing on the motion. The Plaintiff filed a timely Motion for New Trial.
On October 13, 2004, a hearing was held on the attorney's fees issue. On December 10, 2004, the trial judge issued a judgment with reasons reiterating his decision in the prior judgment, and awarding Stephen damages for loss of income for wrongful injunction in the amount of $150,000 plus interest and $49,700.25 in attorney's fees. The fees were apportioned between three attorneys. The Plaintiff subsequently appealed the judgments.

TRADE NAME PROTECTION
Ramsey's asserts that the trial judge erred in finding that the surname "Ramsey" is not protectable under trademark/trade name law, and that his reliance on outdated jurisprudence was legal error. We agree.
"A trade name is a word, name, symbol, device, or other designation, or a combination of such designations, that is distinctive of a person's business or other enterprise and that is used in a manner that identifies that business or enterprise and distinguishes it from the businesses or enterprises of others." Restatement (Third) of Unfair Competition § 12 (1995).
In Gulf Coast Bank v. Gulf Coast Bank & Trust Co., 94-2203, p. 1 (La.4/10/95), 652 So.2d 1306, 1308, the Louisiana Supreme Court overruled prior jurisprudence and recognized a cause of action for infringement of trade names, as part of the law of unfair competition, without proof of fraud. Prior to Gulf Coast Bank, the law as developed in Louisiana required proof of fraud as a requirement in any trade name infringement case. In reaching its conclusion, the Court analyzed the development of the Louisiana law related to trademarks and trade names. See: Gulf Coast Bank, 94-2203 at pp. 3-9, 652 So.2d at 1309-1313. The Court noted that from 1898, a statutory scheme developed whereby trademarks and service marks were accorded substantive statutory protections, but trade names, while allowed to be registered, received no statutory protections for infringement. *1050 Gulf Coast Bank, 94-2203 at pp. 6-7, 652 So.2d at 1311.[3] However, despite the restrictive statutory scheme for trade name infringement,[4] the jurisprudence had long treated trademarks and trade names alike under the law of unfair competition, basing the protection on equity.[5]Gulf Coast Bank, 94-2203 at p. 7, 652 So.2d at 1311-1312.[6]
In overruling the cases that required proof of fraud for trade name protection, the Court in Gulf Coast Bank noted that:
The basis of unfair competition has evolved from one of free trade concerned primarily with the prevention of fraudulent practices, to one of fair trade, with its primary function being to prevent consumer confusion. . . . .The purposes of unfair competition law, particularly in relation to trademarks and trade names, is threefold: (1) to protect the trademark or trade name owner's interest in claiming the benefits of its goodwill; (2) to protect the consuming public; and (3) to encourage competition. . . .A court must balance these interests in any unfair competition or trademark/trade name infringement case.
The protection of the original user of the... name is justified because the user has invested time, work and money in establishing its name and good will, which has significant value and which may serve as a source of profits that should be protected by society. The protection of ... trade names encourages investment in quality, service and other activities that generate good will by insuring the opportunity to recapture the benefits of a favorable reputation. [Citations omitted.]
Gulf Coast Bank, 94-2203 at pp. 20-21, 652 So.2d at 1318-1319. [Emphasis added.]
The Court further noted that consumers rely on trademark or trade names as an indication of consistent and predictable quality in deciding which products to buy or which businesses to patron, and that confusingly similar trademarks or trade names leads to unfulfilled consumer expectations. Gulf Coast Bank, 94-2203 at p. 21, 652 So.2d at 1319.
The Court set out the requirements for relief for trade name infringement. It stated that in such an action, the primary issues are "(1) whether the party seeking the injunction has a protectable proprietary right in the name it seeks to exclude others from using, and (2) if so, whether there has been an infringement of that right." Gulf Coast Bank, 94-2203 at p. 3, 652 So.2d at 1309; Guillot v. Wagner, 98-840, *1051 p. 5 (La.App. 5th Cir.2/10/99), 731 So.2d 335, 337.
In determining whether one has a protectable proprietary right in the trade name, the moving party must first show actual prior use of a mark or name. Gulf Coast Bank, 94-2203 at p. 9, 652 So.2d at 1313; Restatement, § 18. Next, the party must prove that the trademark or trade name is distinctive, either by being inherently distinctive or by having acquired distinctiveness through "secondary meaning." Gulf Coast Bank, 94-2203 at p. 10, 652 So.2d at 1313; Restatement, § 13.
In this case, prior use is not an issue. The question here is whether the name is or has become "distinctive" through the public's identification of jewelry and diamond products with the Ramsey name through its long use of the combination of names, its business practices and advertising. In analyzing the issue of distinctiveness, the law divides trademarks and trade names into generic, descriptive, suggestive, and arbitrary or fanciful. (For a description of these categories, see Gulf Coast Bank, 94-2203 at pp. 10-11, 652 So.2d at 1313-1314; Restatement §§ 13-14.)
A trade name has acquired "secondary meaning" when, because of the nature of the designation and the context in which it is used, prospective purchasers are likely to perceive it as a designation that identifies the business or other enterprise of a particular person. Restatement, § 13, comment e. Thus, words may be protected that would have an ordinary or primary meaning of their own, but, by long use with a particular product, service or business, have come to be known by the public as specifically designating that particular product, service or business. Gulf Coast Bank, 94-2203 at p. 12, 652 So.2d at 1314. Whether a name has acquired secondary meaning is a factual issue. Id.; Restatement § 13, comment e. The plaintiff has the burden of proving secondary meaning. Gulf Coast Bank, 94-2203 at p. 12, 652 So.2d at 1314; Restatement § 13, comment e. Examples are: "Alliance for Good Government" and "Drusilla Seafood Restaurant." See: Alliance for Good Government, Inc. v. St. Bernard Alliance for Good Government, Inc., 96-0635 (La.App. 4th Cir.12/18/96), 686 So.2d 83 and Seafood Restaurant Services, Inc. v. Bonanno, 95-0058 (La.App. 1st Cir.11/9/95), 665 So.2d 56.
The plaintiff's proof may consist of, among other things, 1) direct evidence such as testimony from individual consumers, and surveys, 2) proof of actual instances of confusion, or 3) indirect evidence such as the volume of business done under the name, the length of time the designation has been in use, advertising and promotional efforts, and the conspicuousness of the designation. Gulf Coast Bank, 94-2203 at pp. 11-12, 652 So.2d at 1314; Restatement, § 13.
La. R.S. 51:223.1, the Louisiana antidilution statute, presents a lower burden than the irreparable injury standard, because it applies in the absence of competition and confusion, and only requires a showing of likelihood of injury to business reputation or dilution of a trade name or mark. It states:
Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases ... unfair competition notwithstanding the absence of competition between the parties or in the absence of confusion.

PROTECTION OF SURNAMES
The use of a personal or surname was initially excluded by the jurisprudence from trademark or trade name protection, *1052 absent a contract or the other party's use of the name by artifice or deceit "for the purpose, or with the intent and effect of misleading or confusing the public and palming off his services, goods, or products as that of another." Tharp-Bultman-Sontheimer Co. v. Tharp-Sontheimer-Tharp 147 La. 765, 770-771, 85 So. 906, 908 (1920). Thus, use of one's own name was never unlimited.
In a series of cases following the Tharp-Bultman-Sontheimer Co. case, the courts reiterated this principle and generally declined to protect a surname, unless the use was fraudulent or intended to mislead or confuse the public. In White v. White, 68 So.2d 648, 650 (La.App. 1st Cir.1954), relied on by the trial judge in this case, the First Circuit court cited Tharp-Bultman-Sontheimer Co. and Am.Jur., Trademarks, Tradenames, etc., § 64, page 547, 47 A.L.R. 1189, 1190, to uphold this principal.
In the years since the White case was decided, the law has evolved beyond those restrictions. No longer is proof of fraud necessary to relief in trademark and trade name cases. As the general trademark and trade name law has evolved, so has the law changed in respect to surnames, or "personal names," as they are referred to in the most recent restatement, Restatement (Third) of Unfair Competition § 14 (1995). The 1995 rule states that, although a personal name of someone connected with a business is not inherently distinctive, it can obtain distinctiveness if it has acquired secondary meaning.[7]
Comment (e) of Restatement § 14 states:
e. Personal names. Personal names, including both first names and surnames, are not considered to be inherently distinctive and are therefore protectable as trademarks or trade names only upon proof of secondary meaning. Thus, the first person who adopts a particular personal name to identify the person's goods, services, or business obtains no rights in the designation unless consumers have in fact come to recognize the name as a symbol that distinguishes the products or business of that person from those of others. . . .
Because trademark rights in personal names limit the opportunity for similarly-named persons to exploit their name in business, protection is extended to a prior user only upon proof that the recognition of trademark rights is necessary to prevent the misappropriation of good will and the deception of consumers.
Indeed, at early common law, the recognition of an unencumbered right to use one's name in trade effectively precluded the existence of trademark or trade name rights in personal names despite the possibility of confusion. Although it eventually became settled that the doctrine of secondary meaning can operate to create trademark rights in personal names, the interest of others in the good faith use of their own name retains appropriate influence in the formulation of *1053 relief. See § 35, Comment d. [Emphasis added]
Likewise, the change has been reflected in 74 Am.Jur.2d, Section 50, Trade Marks and Trade Names (2003). It now states that "One may not use one's own name in a business if there is a likelihood of the dilution of a trade name used by a party having established a secondary meaning or an injury to the business reputation of the first user." [Emphasis added.] In addition, 74 Am.Jur.2d, Section 12 notes that a person or family name may by usage acquire a secondary meaning, so as to entitle that user to the trade name protection against unfair or piratical use by another.
As pointed out in Gulf Coast Bank and the Restatement, there exists a public policy of protecting the trade name owner's interest in claiming the benefits of its goodwill, and the protection of the consumer from confusingly similar trade names. Weighed against those considerations is the encouragement of fair competition and the right of a person to use his own name. Allowing surnames to be protected with proof of secondary meaning balances those oft-times competing interests. In light of Gulf Coast Bank, the evolution of trade name protection, and the public policies involved, we find that surnames or personal names can be protected, if there is proof that the name alone or in combination with other words has acquired distinctiveness through secondary meaning in the marketplace. Thus, we find that the trial judge erred in concluding that the Plaintiff cannot protect its use of the Ramsey surname.

PROOF OF SECONDARY MEANING
Ruel Gober (Gober), a friend and customer of the Ramsey family, testified that he was confused when he saw the notice in the newspaper of the establishment of Stephen's company. In fact, Robert, Jr. first discovered Stephen's actions when Gober telephoned to find out about the new expansion. When he saw the newspaper notice for Stephen's new business, Gober believed that the company was branching out. He did not realize that this was a separate business.
In addition, the evidence showed that two companies that dealt with Ramsey's, Gemvision and Northeastern & Lau International, Inc., sent invoices to Ramsey's for products ordered by Stephen.
Ramsey's marketing company executive, Roy Williams (Williams) testified to the efforts made for ten years prior to the dispute to establish the Ramsey name specifically as a diamond and jewelry business. Williams, an expert in marketing and retail sales, including jewelry businesses, owns Williams Marketing which consults with businesses, produces advertisements, markets its customers' products, and trains professional in the field. Williams has been in the business for over 24 years, and has written several books. His Wizard of Ads was book of the year in 1998. Its sequel, Formulas of Wizard of Ads, was number one in the Wall St. Journal's best seller list and was on the New York Times best seller list.
In 1992, Williams was hired by Ramsey's. The company was not well known at the time, even though it was 34 years old. It had never advertised sufficiently in the market, and was producing $500,000 in income. Thus, the Ramsey family hired Williams to help it become a name associated synonymously with diamonds, and that effort has been successful. Williams stated in the first year advertising on the radio, Ramsey's name reached 20% of the potential customers over 18 years of age in the New Orleans metropolitan area. Since Williams' involvement, sales increased *1054 12.5% times its previous sales numbers. In 2003, the company's income was over six million dollars, and now reaches 32-25% of the adult population in the metropolitan area. This increase was directly influenced by numerous radio ads, the purpose of which was to establish the public's "involuntary automatic recall" of Ramsey's name with the product through "extreme repetition." The radio ads were designed to create the identification by the consuming public with it. Williams testified that the success of the "repetition" theory of marketing and advertising is supported and has been documented in scientific literature dealing with this aspect of business and commonly used in the industry.
From 1999 through 2004, Ramsey's produced 71,398 radio ads. Typically, the radio stations used are 100,000 watt stations reaching about 100 miles in every direction from downtown New Orleans. The goal of the radio ads was to reach the same individuals at least three times within seven nights. Using specialized software to monitor large blocks of people, Ramsey's and Williams were able to predict with great accuracy how many times they were reaching the same person. In the winter of 2003, these indicators show that in one week, the ads were reaching 29.9% of the population of the marketing area an average of 3.7 times each. Williams noted that the software used to make these determinations is used by marketing professionals coast to coast. Williams explained that such an advertising campaign is designed to reach people before they have a need for the particular product so that they will think of the company first and feel comfortable about their decision to seek out the particular company's product. Here, they wanted to make the Ramsey name synonymous with diamonds and jewelry. Williams believes that the campaign has achieved the marketing goal. Since the marketing campaign began, Ramsey has never had less than 20% of the jewelry and diamond business in the metropolitan area, including after the downturn in all business following the terrorists attacks of September 11, 2001. In 2001, Ramsey's gross income went from $6,661,167 to $6,565,000. Williams thought that downturn was a direct result of the terrorist bombing, but said it was not a significant drop relative to the marketing program. It also declined in 2002 to $6,170,000. However, Williams stated that other factors can cause a decline such as new competitors in the market, consumer confidence at the local level, and the closing rate by the salespeople.
He noted that the ratings used in his analysis are used by every reputable ad agency in America. No market survey was conducted.
In the 1997 census, there were an estimated 180 jewelers in the area. However, according to Williams, market professionals do not used census information because the categories are too broad. Except for costume jewelry, the census, for example, does not break down the different jewelers into categories reflective of the type of jewelry sold in the various stores. K-Mart is included with high end jewelers. Places selling watches and clocks, new sterling and plated silver are in a single category. Because of the way the census reports jewelers, Williams felt it was an unreliable indicator for market potential. He emphasized that all of his conclusions are based on reputable and documented methods used by all industry professionals.
Williams testified that other companies used the name Ramsey in the area. However, none of those are in the jewelry/diamond business. Stephen is the only other Ramsey who has used the name with jewelry or diamonds.
*1055 Williams testified that after 12 years of intense marketing, any competitor using the Ramsey name in association with diamonds and jewelry in any combination would cause confusion in the market and dilute the effect of the Ramsey name, or brand, in that marketplace, because customers would go to that other business believing that it was Ramsey's. If the competition failed to satisfy the customer, that failure would reflect on Ramsey's. Furthermore, based on his analysis of the marketing program and his experience, any combination of the Ramsey name with "jewelry" and "diamonds" is now associated with Ramsey's.
Robert, Jr. testified that he has been President of the company since 1985, and majority shareholder since his father's death. He has worked in the business since 1975. Stephen and their sister are the only other share holders.
Robert, Jr. testified that from March 31, 1997 through June 30, 2004, the company expended $2,227,000 in ad expenses, and grossed $41,240,000. The ad expenses included radio, television, newspaper ads, direct mailings, yellow page advertisement, and miscellaneous advertising (such as sponsored community events.) Robert, Jr. testified that Ramsey's customers are from the greater New Orleans area, Mississippi, Grand Isle, to the west of Baton Rouge and to the north shore of Lake Pontchartrain. From January of 1999 to October of 2003, 48.1% of the sales have been from Jefferson Parish ($28,057,289.00). This was tracked from calendar year sales from January of 1999 to October of 2003 using the zip codes of 21,075 customers. Robert, Jr. noted that the company was investigating expanding by opening other stores in Baton Rouge, and had negotiated buying property there. He admitted that the company lost $90,000 in income from March of 2001 to March of 2002, and $400,000 from 2001 to 2003. Because of that, Ramsey's started doing more television advertising. He agreed with Williams that the 1997 census is not a reliable marker because the included businesses have more generalized merchandise. Although Ramsey's had sold watches in the past, it stopped doing so long ago. In 1997, it sold some silver items such as baby rattles, but no silverware. By 1997, the business had also stopped selling colored jewelry. There was no decline in business in 2004.
According to the evidence, both Robert, Jr. and Stephen appeared in the various ads, which always mentioned the brothers by names. It was also stipulated that Stephen was in the ads related to the name "Ramsey's Diamond Jewelers." Robert, Jr. noted that the commercials also used the name "brilliantov" in reference to diamonds. Although Ramsey's did not register that word and is not currently using it in conjunction with the business, Robert, Jr. believed that the word, meaning "diamond" in Russian, would still confuse the public if used by Stephen.[8]
Robert, Jr. testified that following the dispute between he and his brother relative to Stephen's conduct in causing disturbances in the workplace, Stephen was placed on leave of absence, and was kept on the payroll for 20 months. He was only terminated after Ramsey's discovered that Stephen started a competing business using the Ramsey name. Robert, Jr. warned him to cease and desist using any of the registered trade names, and to use another name for his business. He believed that there was confusion in the marketplace as shown by Gober, who thought the company *1056 was branching out, and by Ramsey's receipt of invoices from two different companies for items purchased by Stephen. One company, Gemvision, designed and maintains Ramsey's CAD software system, and Stephen had been involved with that company in the past. Prior to these events, wrong invoices may have been sent to the company by mistake, but not due to confusion as to who ordered the items.
Robert, Jr. further testified that he is concerned about losing or having the goodwill diluted that Ramsey's has built up over the years. He felt that the reputation of the company is at stake. Included in that is the employees living up to promises made to the customers and business associates. He said that Stephen has a history of causing customers to be dissatisfied and that he does not want Stephen's behavior to reflect on Ramsey's.
Thomas O'Connor, a marketing expert and senior professor in marketing at University of New Orleans, testified. He personally had heard some of the radio and television ads and found the commercials enjoyable. Professor O'Connor stated that he personally associated the Ramsey name with jewelry.
Professor O'Connor discussed the factors in proving secondary meaning: 1) share of the market, 2) awareness of promotional campaign by individuals, 3) sales volume increase or stability depending on the marketplace conditions, and analysis of the public's behavior. He was convinced after reviewing the evidence that the name Ramsey had obtained a secondary meaning in regard to its trade names. He based his opinion part on the company's disproportionate share of the market, which the 1997 census showed to be 2½% of the market, despite its inclusion with generalized businesses. That is five times what would be expected. Professor O'Connor was also impressed with the zip code evidence showing that Ramsey's did extremely well in Orleans, Jefferson, St. Bernard and St. Tammany Parishes. He further noted the downturn in the business in some years, but said that other factors besides dilution can cause a downturn in business, and that the factors affecting all business in the market would have to be analyzed to find the true cause.
Professor O'Connor testified that the advertising evidence is a factor in establishing secondary meaning. A New Zealand study found that 25% of recall of name was excellent and would be enough to prove secondary meaning. Here, he believed that the commercials were effective because of the times of day and days of the week that they ran, and because the scheduling was aimed at a specific appropriate market. He said that the ads were well produced and the frequency was high.
Professor O'Connor explained that dilution occurs when similar names affect the "senior" name. If the companies are in the same business, it is considered "direct infringement." In this case, the name "Steven Ramsey's Diamonds Direct" would have a negative impact on Ramsey's, because Stephen would be associated with Ramsey's by virtue of his prior activities with the Plaintiff, and his presence in all of the commercials. Professor O'Connor opined that Stephen is directly competing with Ramsey's and is attempting to trade on its market position. He included the effect on the use of the word "brilliantov," although he admitted that he did not know what the word meant until this litigation. He stated that Stephen could easily use the words "diamond" and "brilliantov" without the Ramsey name to avoid confusion.
Professor O'Connor stated that specific confusion could not be shown in this case, because Stephen stopped using the name before he had a chance to aggressively *1057 compete under the Ramsey name. Not until he did so would the confusion manifest. Professor O'Connor testified that he did not need a market survey to reach his conclusion based on his 34 years experience and the evidence. He believed that the Ramsey name had obtained secondary meaning in regard to "jewelry," "diamonds" and "brilliantov," and that Stephen's use of the same name with those words would constitute dilution of the Ramsey name.

INVOLUNTARY DISMISSAL AND PERMANENT INJUNCTION
When a motion for involuntary dismissal is made in a non-jury case, the trial judge must evaluate all the evidence, without any special inferences in favor of the opponent to the motion, and grant the dismissal if the plaintiff has not established proof by a preponderance of the evidence. Crowell v. City of Alexandria Through Snyder, 558 So.2d 216, 218 (La.1990). Proof by a preponderance of the evidence means that the evidence, taken as a whole, shows that the fact or cause sought to be proven is more probable than not. Id.
The issuance of a permanent injunction takes place only after a trial on the merits in which the burden of proof is a preponderance of the evidence. Mary Moe, L.L.C. v. Louisiana Bd. of Ethics, 03-2220, p. 9 (La.4/19/04), 875 So.2d 22, 29. The appellate court reviews the granting or denial of a preliminary injunction under the manifest error standard. See: Id. The standard is the same for a permanent injunction.
Under La. C.C.P. art. 3608, the trial judge may award damages and/or attorney's fees to a party for the wrongful issuance of a preliminary injunction on a motion to dissolve the injunction, or on a reconventional demand.
After our review of the evidence, we find that Ramsey's proved by a preponderance of the evidence that there would be confusion in the market place if Stephen is allowed to use the Ramsey surname alone (without Stephen or Steve), in conjunction with the words "jewelers," "jewelry" or "diamonds." The evidence of the experts is exactly the type of evidence that the Louisiana Supreme Court and the Restatement have indicated should be considered in determining secondary meaning. Furthermore, the Defendants produced no contradictory evidence, nor did their questioning of the experts raise any significant facts to cast doubt on the conclusions reached by them. Thus, we find that Ramsey's registered trade names ("Ramsey's Manufacturing Jewelers, Inc., "Ramsey's Jewelers," "Ramsey's Jewelry," and "Ramsey's Diamond Jewelers,") have acquired secondary meaning entitling it to trade name protection. We will, therefore, reverse in part the judgment granting the involuntary dismissal and dismissing the Plaintiffs' claims, and grant the injunction relative to Ramsey's registered trade names.
However, the evidence does not support Ramsey's claims relative to the name "Steve Ramsey's Diamonds Direct, L.L.C.," or "Brilliantov by Steve Ramsey, L.L.C." While we agree that there would be confusion in the market place if Stephen is allowed to use the Ramsey surname alone in conjunction with the words "jewelers," "jewelry" or "diamonds," Stephen has attempted to sufficiently distinguish his business by including both his first and surname in his business's trade names. We find therefore, that Ramsey's failed to carry its burden of proof in preventing Stephen from using both his first and surname in conjunction with the trade names "Steve Ramsey's Diamonds Direct, *1058 L.L.C., and "Brilliantov by Steve Ramsey, L.L.C."
The trial judge was silent as to Stephen Ramsey's use of the name "Brilliantov by Steve Ramsey, L.L.C.," although that question was placed at issue at trial. In light of our decision here, we therefore affirm that part of the involuntary dismissal and that portion of the judgment allowing Stephen to utilize "Steve Ramsey's Diamonds Direct, L.L.C., and amend the judgment to allow Stephen Ramsey the use of the name "Brilliantov by Steve Ramsey, L.L.C."

DAMAGES
Ramsey's contends that the trial judge erred in the damage award. We agree. The trial judge awarded the Defendant an amount of damages based on his salary during his employment with Ramsey's.
This was not a wrongful termination case. Lost profits are the proper measure of business damages here. Thus, the Defendants had the burden of showing what his estimated gross profits reasonably would have been had he been allowed to operate his business under his name. The salary he was paid as an employee with Ramsey's is not relevant to this determination. Since the Defendants failed to produce any evidence of estimated lost profits, they failed to prove their damages resulting from the preliminary injunction.
In addition, Stephen testified that he stopped all efforts at establishing any type of jewelry business after the injunction was issued in September of 2003. Stephen is an experienced jeweler. Yet, he did not attempt to find a job in the jewelry business pending the outcome of the suit, or start a jewelry business under a name that would have been controversy free. In effect, he did nothing to earn any income following the injunction. He explained that he did nothing because he was "scared" to continue in the jewelry business. Since Stephen failed to prove his damages and failed to mitigate any damages from the preliminary injunction, we will reverse the damage award.

ATTORNEY'S FEES
Stephen Ramsey was successful in obtaining the result he desired, protecting his right to use his own name in connection with his business. Thus, he is entitled to an award of attorney's fees, as found by the trial judge. The trial judge has discretion in the amount of these attorney fees. He heard the evidence and observed the witnesses. The question before us is whether he abused his discretion. We find no abuse of discretion in the amount of attorney's fees awarded by the trial judge.

DECREE
Accordingly, the judgment of the trial court is reversed in part, and the Defendants are permanently enjoined from using the registered trade names "Ramsey's Manufacturing Jewelers, Inc., "Ramsey's Jewelers," "Ramsey's Jewelry," and "Ramsey's Diamond Jewelers," or the Ramsey name alone in conjunction with the words "jewelry," "jewelers" and "diamonds." Further, we reverse the award in favor of Defendants and against Ramsey's for lost income of Stephen Ramsey. We affirm the judgment insofar as it permits Defendants to use Stephen Ramsey's first and surname in conjunction with the trade names "Steve Ramsey's Diamonds Direct, L.L.C.", and amend the judgment to award Stephen Ramsey the right to use the his trade name, "Brilliantov by Steve Ramsey, L.L.C." Furthermore, we affirm the attorney's fees awarded to Defendants and affirm the judgment dismissing Ramsey's claim for damages against *1059 Defendants.[9] The costs of this appeal are to be divided between the parties.
AFFIRMED IN PART, AMENDED IN PART, AND REVERSED IN PART.
NOTES
[1] A writ was taken from the ruling, but this Court found the judgment to be appealable. No further action was taken by the Defendants at that time.
[2] The exceptions were never ruled on in the trial court.
[3] See discussion of the development of La. R.S. 51:211 et seq. at Gulf Coast Bank, 94-2203 at pp. 3-6, 652 So.2d at 1309-1311.
[4] 1898 La. Acts, No. 49; 1906 La. Acts, No. 112. Note: In 1954 the statutory scheme for the registration and protection of trademarks was revamped and made applicable to a broader range of trademarks in 1954 La. Acts, No. 235, designated as La. R.S. 51:211 et seq. Gulf Coast Bank, 94-2203 at p. 3, 652 So.2d at 1309.
[5] New Orleans Checker Cabs, Inc. v. Mumphrey, 205 La. 1083, 18 So.2d 629 (1944); Albrecht v. Del Bondio, 188 La. 502, 177 So. 587 (1937); Marcev v. Mandich, 158 La. 15, 103 So. 389 (1925); Yellow Cab Co. of New Orleans, Inc. v. Jones, 156 La. 837, 101 So. 216 (1924); Boogie Kings v. Guillory, 188 So.2d 445 (La.App. 3rd Cir.1966); Paducah Distilleries Co. v. Crescent Mfg. Co., 6 Orl.App. 151 (1909).
[6] Citing New Orleans Checker Cabs, Inc., supra; Handy v. Commander, 49 La. Ann. 1119, 22 So. 230 (1897); Givens Jewelers, Inc. v. Givens, 380 So.2d 1227 (La.App. 2nd Cir. 1980); Arbutnot, Latham & Co., v. Gag-Drew Co., 6 Orl.App.374 (1909), and Robinson Tradenames and Trademarks-State and Federal: Some Random Observations, 22 La.B.J. 179 (1974).
[7] Restatement (Third) of Unfair Competition § (1995), states:

§ 14. Descriptive, Geographic, And Personal Name Designations
A designation that is likely to be perceived by prospective purchasers as merely descriptive of the nature, qualities, or other characteristics of the goods, services, or business with which it is used, or as merely geographically descriptive of their origin or location, or as the personal name of a person connected with the goods, services, or business, is not inherently distinctive under the rule stated in § 13(a). Such a designation is distinctive only if it has acquired secondary meaning under the rule stated in § 13(b). [Emphasis added.]
[8] Ramsey's did not challenge Stephen's use of the word "brilliantov" in the original petition, but the Defendants did not object to this enlargement of the pleadings, and questioned Robert, Jr. and Professor Thomas O'Connor about that claim. See: La.C.C.P. art. 1154.
[9] The Plaintiff did not address this issue at trial.